**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59577-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JENNY NICOLE PURPLE, | |
| Appellant. | |

PRICE, A.C.J. — Joan Seedorf lived with her daughter, Jenny N. Purple and Purple's husband, Eugene Cosby, in Camas, Washington.[1] Because Joan was elderly, Purple acted as her power of attorney, which gave her control over Joan's bank accounts.

In 2019, the Camas police department, after a referral from adult protective services, launched an investigation into whether Purple and Cosby were financially exploiting Joan. The investigation revealed that between 2015 and 2020, Purple had used large amounts of Joan's funds for Purple and her family's benefit. The State eventually charged, and a jury convicted, Purple of one count of first degree theft, three counts of first degree theft from a vulnerable adult, and one count of money laundering.

---

[1] Because the record references Joan and her husband John, and they share the same last name, we refer to them by their first names for clarity.

No. 59577-0-II

Purple appeals, arguing that her convictions should be reversed because the State committed prosecutorial misconduct during closing arguments. She also raises the additional arguments that counts II and III of her charges should be reversed because she was deprived of her right to a unanimous jury verdict and that counts IV and V should be reversed because there was insufficient evidence to support them.

We hold that Purple was deprived of a unanimous verdict for counts II and III, but we otherwise see no error. Thus, we reverse in part and affirm in part.

FACTS

I. BACKGROUND

A. JOAN MOVES TO CALIFORNIA AND PURPLE BECOMES HER POWER OF ATTORNEY

Until 2014, Joan and her husband John lived in New Jersey. In 2014, Joan moved from New Jersey to California to live with Purple and Cosby, in part to help Purple take care of her firstborn child. John remained living in New Jersey.

Shortly after Joan moved in with Purple's family in California, Purple noticed that Joan's memory was starting to decline. Around this same time, John expressed interest in joining the family in California; however, Joan wanted to keep her finances separate from John. Because of the combination of Joan's "mild memory loss" and Joan's desire to keep her assets separate from John, Joan and Purple made the plan to have Purple become Joan's power of attorney and then to purchase a home together in the Pacific Northwest. Verbatim Rep. of Proc. (VRP) at 170. Purple became Joan's power of attorney in November 2014, with Cosby named as Purple's alternate or successor.

2

As Joan's power of attorney, Purple was authorized to "manage and conduct all of [Joan's] affairs and to exercise all of [Joan's] legal rights and powers." Ex. 1 at 155. Among other things, the power of attorney gave Purple broad authority to manage Joan's finances. Purple was authorized to

> [c]onduct any business with any banking or financial institution with respect to any of [Joan's] accounts, including, but not limited to, making deposits and withdrawals, negotiating or endorsing any checks or other instruments with respect to any such accounts, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to [Joan] by any person, firm, corporation or political entity.

Ex. 1 at 155. Purple could also "[s]ell, exchange, buy, invest, or reinvest any assets or property" that Joan owned or would own in the future. Ex. 1 at 155.

The power of attorney also authorized Purple to make gifts on Joan's behalf to individuals "with whom [she had] an established pattern of giving." Ex. 1 at 156; VRP at 467. However, Purple was prohibited from gifting, appointing, or designating any of Joan's assets directly or indirectly to herself, her estate, or her creditors. To avoid any conflicts of interest, Purple was obligated to keep her property separate and distinct from Joan's.

The power of attorney document further cautioned Purple against taking possession of Joan's assets.

> You may not transfer the principal's property to yourself without full and adequate consideration or accept a gift of the principal's property unless this Power of Attorney specifically authorizes you to transfer property to yourself or accept a gift of the principal's property. If you transfer the principal's property to yourself without specific authorization in the Power of Attorney, you may be prosecuted for fraud and/or embezzlement. If the principal is 65 years of age or older at the time that the property is transferred to you without authority, you may also be prosecuted for elder abuse. . . .

Ex. 1 at 162-63; VRP at 473-74.

B. FAMILY'S MOVE TO CAMAS, WASHINGTON

As part of Joan and Purple's joint plan, Purple purchased a home in Camas, Washington, in April 2015 for $515,000. Although the money for the home came primarily from Joan's money, Purple was listed as the home's owner. Joan's money was also used to purchase two vehicles for the family's use in Washington. Purple later described the purchase of the Camas house as a "gift" from Joan. VRP at 177.

Also in 2015, Purple and Joan opened a joint bank account that was mainly funded by Joan's assets. Purple was not employed, so the account's source of income was Joan's deferred compensation retirement benefits from her time as a teacher in New Jersey as well as her social security benefits. Purple would use the joint account to pay for things such as her children's schooling and daycare, Cosby's child-support obligations, restaurants, vacations, Cosby's business, and repairs to the home.

C. JOHN'S MOVE TO WASHINGTON AND PURPLE'S SUBSEQUENT PETITION FOR A VULNERABLE ADULT PROTECTION ORDER FOR JOAN

In November 2017, John moved to Washington and joined Joan and the family in the Camas house. About a year after John moved in, in November 2018, Joan and John suspected that Purple and Cosby might be stealing from them, so John made a report to police and to adult protective services (APS).

A few months after the police and APS began their investigations, Purple obtained a vulnerable adult protection order (VAPO) against John, causing him to be removed from the Camas house. Purple had become concerned that John had behavioral issues and was prone to

4

anger, violence, and excessive control over Joan. After his removal from the Camas house, John became homeless.

D. APS INVESTIGATION AND PURCHASE OF TILLAMOOK HOUSE

An APS investigator visited the Camas home and reviewed bank statements from their joint account. A hearing on the matter was eventually scheduled for the first week of March 2020.

About a week before the hearing, Joan's funds were used to purchase a vacation home in Tillamook, Oregon, for $336,500. Ex. 23. The home was purchased by "Joan Selin LLC."[2] Ex. 24; VRP at 278. The LLC listed Joan as the sole member; however, it listed Cosby as its chief operating officer.

Following the hearing, Greg Swanson was appointed as Joan's guardian ad litem. Swanson determined that Joan was not capable of managing her finances. While Joan had been physically well cared for by Purple and Cosby, Swanson determined that Purple's frequent use of the account for the benefit of herself, Cosby, and their children violated Purple's power of attorney. He found that 97.8 percent of the funds from Purple and Joan's joint account came solely from Joan. VRP at 529. Swanson specifically took issue with checks that had been written from the joint account directly to Purple, Cosby, and their children that were "clearly not for Joan['s] . . . benefit." VRP at 545. Even if the checks were characterized as gifts, that was not acceptable under the power of attorney.

---

[2] Based on our record, "Selin" appears to be Joan's last name prior to her marriage to John. VRP at 636.

Although Joan was the sole member of the LLC, Swanson also believed that the company was created primarily for the benefit of the family as a whole, not for Joan. He explained, though, that Joan did benefit, in some sense, from the vacation home:

> The LLC was certainly not for the benefit of Joan. The home, I did understand, from talking with Joan and her daughter, Ms. Purple, that they were very interested in having a home that they could go to for vacations and just time away, a home near the beach.
>
> So, in that sense, it was a benefit to Joan to have the home.

VRP at 537.

Despite Swanson's findings, he believed that a civil settlement was in Joan's best interest so that she could continue living with Purple and Cosby. Although Swanson dissolved the LLC, Joan also apparently decided to maintain ownership of the Tillamook home so that she could still use it.

E. CRIMINAL CHARGES ARE BROUGHT AGAINST PURPLE AND COSBY

Although Swanson advocated for a non-criminal solution, law enforcement reached a different decision. In October 2021, following the police's investigation, the State charged Purple with five counts related to the theft of Joan's (and/or John's) money through multiple transactions occurring between 2015 and 2021.

The Information included several different counts, some of which included transactions divided by specific date ranges. Count I was for first degree theft for transactions occurring between April 1, 2015, and June 1, 2015. Counts II and III were for first degree theft from a vulnerable adult for transactions occurring between July 24, 2017, and January 1, 2018 (count II), and transactions occurring between January 2, 2018, and January 1, 2019 (count III).

6

Counts IV and V were both related to the purchase of the Tillamook house. Count IV was for first degree theft from a vulnerable adult for the Tillamook house transaction, and count V was for money laundering predicated on the theft charge in count IV.

The case proceeded to a jury trial.

II. TRIAL TESTIMONY

A. DEBORAH CARROLL'S TESTIMONY

Deborah Carroll was a forensic accountant for the police investigation into Purple and Cosby. Her testimony focused on her analysis of Purple's, Cosby's, and Joan's bank statements, deposits, and withdrawals that had been obtained by the police.

Carroll explained in detail her findings about Purple and Joan's joint bank account between 2015 and 2020, listing checks that were written to pay for childcare, Cosby's business, Cosby's child support obligations, legal expenses, as well as personal checks written to Purple, Cosby, and their children. Although there were many transactions where Carroll could easily identify whether they were for Joan's benefit or for the rest of the family's benefit, there were some checks issued from the joint account that Carroll could not discern for whose benefit they were issued.

B. JIM SENESCU'S TESTIMONY

Jim Senescu was John's attorney who helped John throughout the process of reporting Purple and Cosby to APS. While testifying about characterizing John's assets, Senescu provided testimony related to Washington being a community property state. Senescu and the State engaged in the following exchange:

[State:] . . . Is Washington a community property state?
[Senescu:] Yes.
. . . .

[State:] Can you explain what community property state means?

[Senescu:] It means if a couple is married, all property that either one of them has is presumed to be community property, so that each has an interest in the other half.

[State:] Okay. So if someone was receiving SSI or retirement and they're married, would that belong to both in the couple?

[Senescu:] Yes.

[State:] Do you know if New Jersey is a community property state off the top of your head?

[Senescu:] I do not.

VRP at 463-64. At some later point, the State asked the trial court to take judicial notice that New Jersey was not a community property state. The trial court agreed.

III. JURY INSTRUCTIONS

After the presentation of evidence, the trial court instructed the jury. The to-convict instruction for the counts of first degree theft from a vulnerable adult (counts II-IV) provided that the jury would have to find that, during the specified period, Purple

(1) . . . wrongfully obtained or exerted unauthorized control over property of a vulnerable adult;

(2) That the property exceeded $5,000 in value;

(3) That the defendant intended to deprive the other person of the property;

(4) That the other person was a vulnerable adult;

(5) That the defendant knew or should have known the victim was a vulnerable adult; and

(6) That this act occurred in the State of Washington.

Clerk's Papers (CP) at 272-74. The jury was also instructed that so long as a series of transactions was part of a "common scheme or plan," they were permitted to aggregate the total of multiple transactions to meet the $5,000 required for first degree theft. CP at 271.

However, the jury was not asked to make an express finding as to whether the transactions were part of a common scheme or plan. The jury was also not given a unanimity instruction, which would have instructed the jury that it had to be unanimous about which specific transactions were being used to find Purple guilty of the specific counts.

IV. THE STATE'S CLOSING ARGUMENT AND THE JURY'S VERDICT

The State began its closing argument with a timeline of the events of the case, starting in 2014, when Joan first moved in with Purple. The State then continued to describe Purple and Joan's relationship throughout the years and the transactions that took place while Purple was Joan's power of attorney.

When the State began discussing John's eventual move to Washington, it argued that John owned half of Joan's income because Washington was a community property state. The State explained,

> You heard that—the next thing you heard was that in November of 2017, John moves to Washington, who sells the house in New Jersey and moves to Washington. Now, keep in mind, Washington is a community property state. So, from the second that John joins Joan in Washington, her income is now community property belonging to both of them.

VRP at 842-43. The State went on to discuss the timeline of events that followed John's move to Washington, including that he was eventually removed from the Camas house in 2019 due to the VAPO Purple obtained for Joan. The State reiterated that John had an interest in Joan's income because it was considered community property.

> After April of 2019, you heard that John no longer lives in the Camas home. His funds are then mostly depleted after April 2019. He only has about $1,000 a month coming in from his social security check. And that there were no transfers made from [Purple] or [Cosby] or Joan to John after he leaves the Camas home.

9

> Now, remember, community property state. Half of her income belongs to John.
> Half of his income belongs to Joan.

VRP at 847. The defense objected to the State's comments, arguing that it was a misstatement of

law and that community property was "way more complicated" than the State was making it out

to be. VRP at 847.

The trial court overruled defense counsel's objection, reasoning that the jury had been

advised that "the lawyers' statements are just arguments only" and that the jury should rely only

on the evidence that had been admitted. VRP at 847.

The State then continued its argument, repeating that John was receiving minimal income

and explaining how he eventually became unhoused.

> You heard that in October of 2019, John is living in a tent in Camas. He's getting
> around $1,000 a month in SSI, and he has no other income. You heard that Sergeant
> Chaney becomes concerned about John's safety. He's worried that he's not going
> to make it through the winter. . . .

VRP at 849.

The State next showed the jury tables which listed different transactions from Purple and

Joan's joint account that were presented to the jury during witness testimony.

For count II, the State showed the jury the following table that highlighted specific

transactions it contended supported the count (count II pertained to transactions occurring between

July 24, 2017, and January 1, 2018).

| Transaction Date | Withdrawal | Check No. | Detail | Memo Line |
|---|---|---|---|---|
| 08/11/2017 | $3,000.00 | 379 | Eugene Cosby – BofA - 1381-1640-5364 | |
| 08/31/2017 | $2,175.00 | 477 | CCE/Camas School District | preschool |
| 10/12/2017 | $1,000.00 | 485 | NYS Child Support Processing Center | Eugene Cosby III BQ90582M1 |

| 10/23/2017 | $1,000.00 | 486 | Eugene Cosby – Green Mint – BoA – 1381 – 1837-1551 | |
| 11/01/2017 | $100.00 | 489 | Debbie Rodgers | [U.C.] |
| 12/19/2017 | $4,012.56 | 498 | NYS Child Support Processing Center | Eugene Cosby III BQ90582M1 |
| 12/28/2017 | $1,500.00 | 499 | Courage Esbe Cosby | Disney performance trip |
| **TOTAL** | **$12,787.56** | | | |

CP at 441. Notwithstanding the specific transactions listed on the table, the State did not focus the jury on any particular transaction or combination of transactions. Instead, the State repeatedly argued that the listed transactions were "just the tip of the iceberg" and that the table "doesn't show all of the other transactions." VRP at 861.

> For Count 2 for Ms. Purple, they have another exhibit, again, prepared from the data contained in Exhibit 34. And this is checks that were written in that period of time, from July 24, 2017. Again, just checks. *Just the tip of the iceberg. It doesn't show all of the transactions.*
>
> . . . .
>
> Those checks total over $12,000, to almost $12,800. *Again, just the tip of the iceberg of what is in the exhibits that are admitted.* Well over the $5,000 required to prove Count 2.

VRP at 860-61 (emphasis added).

For count III, the State presented a similar table of transactions from the joint account (count III pertained to transactions that occurred between January 2, 2018, and January 1, 2019).

| Transaction Date | Withdrawal | Check No. | Detail | Memo Line |
| --- | --- | --- | --- | --- |
| 01/28/2018 | $1,500.00 | 509 | Eugene Cosby - Green Mint - BofA 1381-1837-1551 | |
| 02/15/2018 | $200.00 | 513 | CCE/Camas School District | Preschool & preK |

| | | | | |
|---|---|---|---|---|
| 04/26/2018 | $2,828.28 | 535 | Eugene Cosby - Green Mint - BofA 1381-1837-1551 | |
| 06/01/2018 | $1,700.00 | 541 | Eugene Cosby - Green Mint - BofA 1381-1837-1551 | Apple |
| 06/11/2018 | $397.00 | 546 | CCE/Camas School District | summer camp |
| 07/27/2018 | $4,000.00 | 554 | Eugene Cosby - Green Mint - BofA 1381-1837-1551 | business expenses |
| 09/05/2018 | $2,150.00 | 561 | CCE/Camas School District | sept-dec |
| 09/11/2018 | $4,000.00 | 563 | NYS Child Support Processing Center | Eugene Cosby III BQ90582M1 |
| 09/13/2018 | $75.00 | 565 | CCE/Camas School District | [C.C.]preschool december |
| 12/05/2018 | $9,000.00 | 587 | Jenny Purple - IQCU - 637368-00 | |
| 12/05/2018 | $9,000.00 | 589 | [C.C.]– IQCU - 637374-00 | |
| 12/05/2018 | $9,000.00 | 590 | [A.C.]- IQCU - 637384-00 | |
| 12/05/2018 | $9,000.00 | 591 | [E.C.] - IQCU - 637380-00 | |
| 12/06/2018 | $9,000.00 | 592 | Jenny Purple - Wells Fargo - 1097960445 | |
| 12/07/2018 | $9,000.00 | 593 | Eugene Cosby - Green Mint - BofA 1381-1837-1551 | |
| 12/14/2018 | $9,000.00 | 597 | Jenny Purple - Wells Fargo - 1097960445 | |
| **TOTAL** | **$79,850.28** | | | |

CP at 442. But once again, the State repeated that these transactions were "[j]ust the tip of the iceberg." VRP at 863.

> Again, I have a different demonstrative exhibit prepared from Exhibit 34 for Count 3. In this period of time, from January 2 of 2018 to January 1 of 2019, these are just checks. *Again, just checks. Just the tip of the iceberg that you can see.*

VRP at 863 (emphasis added).

12

After presenting each table, the State explained how the evidence supported each element of first degree theft from a vulnerable adult.

The State went on to discuss how it had proved the elements of count IV and count V with the evidence it had presented regarding the purchase of the Tillamook house. The State contended that circumstantial evidence showed that even though Joan was the financial beneficiary of the LLC, Purple and Cosby were the ones "driving the boat." VRP at 868. The State argued that Purple and Cosby had created the LLC in order to maintain control over Joan's finances after the APS hearing, explaining,

> It is circumstantial evidence that Joan was not involved in this. It is circumstantial evidence that they exerted unauthorized control. Joan is not capable of creating an LLC. Joan is not capable of using an online portal to cash out her investment fund.
>
> . . . [Purple] and [Cosby] were present for every single step along the way; that [Purple] and [Cosby] who were the ones controlling her finances; and that [Purple] and [Cosby] are the ones who took those actions.

VRP at 867-68.

The State also argued that this evidence in turn supported count V. It contended that Purple's unlawful creation of the LLC was a means to maintain access to Joan's money that it had proved in count IV, coupled with the purchase of the Tillamook house, was sufficient to prove Purple's guilt for money laundering.

As the State concluded, it reminded the jury that Purple's and Cosby's crimes "involved multiple incidents" and that because Washington was a community property state, "when they're stealing from Joan, they're also stealing from John in a lot of instances." VRP at 875.

The jury found Purple guilty of all charges. Purple appeals.

ANALYSIS

Purple argues that her convictions should be reversed for several reasons; specifically, (1) the State committed prosecutorial misconduct when it misstated the effect of community property law during closing argument, (2) that her right to a unanimous verdict was violated for counts II and III, and (3) that insufficient evidence supported her convictions for counts IV and V related to the purchase of the Tillamook house.

We agree that Purple's right to a unanimous verdict was violated for counts II and III, but we otherwise affirm her convictions.

## I. PROSECUTORIAL MISCONDUCT

Purple argues that the State committed prosecutorial misconduct during closing argument when it stated that because Washington is a community property state, Joan's income from deferred compensation and social security became community property as soon as John joined her in Washington. Although we agree that the State's comments were improper, we disagree that Purple has shown prejudice.

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper. *State v. Houser*, 30 Wn. App. 2d 235, 271, 544 P.3d 564, *review denied*, 3 Wn.3d 1015 (2024). Misstating the law is an example of an improper statement. *State v. Azevedo*, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024).

Once it is established that the State's conduct was improper, the defendant must then prove that the improper conduct was prejudicial. *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006). Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *Id.* (internal quotation marks omitted)

(quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). If the defendant objects at trial, " 'the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " *Azevedo*, 31 Wn. App. 2d at 78 (quoting *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)).

Purple argues that the prosecutor's comments alleging that under Washington's community property laws that "half Joan's income belongs to John, and half of his income belongs to her" were misstatements of the law. Br. of Appellant at 23. According to Purple, while the prosecutor's witnesses testified to the general principle in community property that "all property acquired during the marriage by either spouse is presumed to be community property," because of the unique character of Joan's income (deferred compensation earned while working in the noncommunity property state of New Jersey and social security benefits), Joan's income was actually separate property from John's. Br. of Appellant at 24 (internal quotation marks omitted). Purple contends that the prosecutor's improper comments were "misleading and blur[red] the basis on which the jury could convict [her]." Br. of Appellant at 26. This was especially harmful because it "encouraged the jury to sweep evidence about John's living conditions into its consideration of whether Ms. Purple committed the alleged thefts," instead of just the evidence at hand. Br. of Appellant at 27.

We agree with Purple that the State's comments were improper. As noted in defense counsel's objection at closing argument, the application of community property principles to retirement assets is "way more complicated." VRP at 847. For example, it is well-established in Washington that deferred compensation retains the character of the location where the couple was domiciled at the time it was earned. *In re Marriage of Smith*, 158 Wn. App. 248, 259, 241 P.3d

449 (2010) ("Retirement or pension benefits are deferred income and, as a consequence, benefits that accrue during a term of employment are characterized in the same way as the income earned during that term of employment."). The State's oversimplification of the application of community property law to this case was a misstatement of the law.

Nevertheless, Purple cannot show prejudice because the statements do not rise to the level of having a substantial likelihood of affecting the jury's verdict. *See Azevedo*, 31 Wn. App. 2d at 78. The statements were limited and a minimal part of the State's case against Purple. Indeed, there was ample evidence to show that Purple intentionally deprived Joan of her money between 2015 and 2020, and none of that evidence turned on the application of community property principles. During the time periods designated in the charging document, the State presented evidence that Purple used Joan's money to purchase a house in Purple's name, write herself and her children personal checks, pay for childcare, go on vacation, and pay for Cosby's business expenses. Regardless of whether Joan's income was hers and John's or Joan's alone, there is no reasonable probability that the outcome of the trial was materially affected by the State's remarks. *See Weber*, 159 Wn.2d at 270. Thus, Purple's claim for prosecutorial misconduct fails.[3]

II. JURY UNANIMITY

Purple argues that she was denied her right to a unanimous jury verdict for two of her convictions, specifically for count II (first degree theft from a vulnerable adult between July 2017

---

[3] We are also unpersuaded by Purple's contention that the State's misstatement prejudiced her by appealing to the jury's passions by highlighting the fact that John was homeless after Purple obtained a VAPO against him. Given the strength of the evidence of Purple's use of Joan's funds, we disagree that the State's community property comments even when coupled with the jury's knowledge of John's housing status would have affected the outcome of trial.

and January 2018) and count III (first degree theft from a vulnerable adult between January 2018 and January 2019). The State concedes error but argues that the error was harmless. We agree with the parties that the trial court erred, and we agree with Purple that the error was not harmless.

Criminal defendants are guaranteed the right to a unanimous jury verdict under both our federal and state constitutions. U.S. CONST. amend. VI; Const. art. I, § 22. Issues of jury unanimity often occur when the State alleges that the defendant committed multiple acts of misconduct, and any one of them could be the basis for the charged crime. *See, e.g.*, *State v. Aguilar*, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023) (defendant challenged unanimity of jury verdict when there were two distinct instances of criminal conduct); *State v. Bobenhouse*, 166 Wn.2d 881, 894, 214 P.2d 907 (2009) (defendant challenged unanimity of jury verdict when the victim testified that the defendant "regularly" sexually assaulted him).

In these "multiple acts" cases, there are two ways to protect the defendant's right to a unanimous verdict: (1) the State elects which specific act it is relying on to convict the defendant or (2) the trial court provides a "*Petrich*"[4] or unanimity instruction and "instruct[s] the jury that it must unanimously rely on a specific criminal act to support its conviction." *Aguilar*, 27 Wn. App. 2d at 924. Either the State's election or the trial court's unanimity instruction ensures that all 12 jurors agree that the same criminal act has been proved beyond a reasonable doubt. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007).

If, in a multiple acts case, there is neither an election nor a unanimity instruction, prejudicial error is presumed. *Id.* Without these safeguards, the possibility opens for some jurors to rely on

---

[4] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

one act or incident while others rely on others—or a "lack of unanimity." *Id.* "[E]ach juror may arrive at a guilty verdict by responding to testimony about discrete incidents—incidents which, if an election were made, the jury may not all agree occurred." *Id.*

We will reverse a conviction based on this error unless the State can prove that the error was harmless beyond a reasonable doubt. *Id.* In this context, error is harmless "only if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Id.* Because such error meets the manifest constitutional error requirement in RAP 2.5, it may be raised for the first time on appeal. *Aguilar*, 27 Wn. App. 2d at 918.

While this bar is high, courts have found this error to be harmless when "there is no material difference in the evidence supporting one act and the evidence supporting another." *Id.* at 928. For example, in *Bobenhouse*, our Supreme Court held that the absence of a unanimity instruction was harmless even though the victim testified about two separate acts of rape. 166 Wn.2d at 894-95. The court explained any error was harmless because both incidents were "independently capable" of supporting the charge and the defendant responded to the victim's allegations with only a "general denial," without offering evidence that would allow the jury to discriminate between the two incidents. *Id.* at 894-95. The court reasoned, "if the jury . . . reasonably believed that one incident happened, it must have believed each of the incidents happened." *Id.* at 895. Put another way, with the only evidence being the testimony from the victim and the general denial of the defendant (that did not differentiate between the two incidents), the jury was left with the choice to either believe the victim or the defendant. And, because the jury convicted the defendant, the jury believed the victim and must have believed that the two instances occurred. *Id.*

In contrast, our Supreme Court has held that when there is "conflicting testimony" regarding the occurrence of some of the instances, the lack of unanimity instruction was reversible error. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988*) abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). The *Kitchen* court explained that because the defendant and other witnesses introduced evidence that contradicted the victim's allegations and both the victim and the defendant's general character and reputations, "a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred." *Id.* at 412.

Here, in order to convict Purple of first degree theft from a vulnerable adult, the State was required to prove that she wrongfully obtained or exerted unauthorized control of Joan's property in an amount exceeding $5,000 during the specified time periods of each count (count II—July 2017-January 2018 and count III—January 2018-January 2019). RCW 9A.56.400(1)(a).

To achieve this minimum amount, the State could have avoided the concerns raised in "multiple acts" cases by having the jury find that the multiple thefts were part of a "continuing course of conduct." *See State v. Garman*, 100 Wn. App. 307, 317, 984 P.2d 453 (1999), *review denied* 141 Wn.2d 1030 (2000) (explaining that if the jury found that the multiple acts were part of a common scheme or plan then "the multiple instances of theft may be considered as part of a continuing course of conduct"); *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (explaining that either a *Petrich* instruction or an election is required only when "the State presents evidence of 'several distinct acts,' " not when it presents evidence of a "continuing course of conduct" (internal quotation marks omitted) (quoting *State v. Petrich*, 101 Wn.2d 566, 571, 683 P.2d 173 (1984)). But this requires that the jury make an *express finding* that the thefts were

part of a "common scheme or plan, a continuing course of conduct, and a continuing criminal impulse." *Id.* Without this express finding, an election from the State or a unanimity instruction from the trial court was required in order to protect Purple's right to a unanimous verdict. *Id.*

Purple argues that none of the unanimity protections occurred here—no express jury finding of a common scheme or plan or continuing course of conduct, no election from the State, and no *Petrich* instruction. Although the jury was generally instructed on the definition of a "common scheme or plan," the jury was not asked to make an express finding that the transactions for either count II or count III constituted such a scheme or plan. And although the State provided a chart of transactions to the jury during closing argument, Purple argues that the State failed to clearly elect because it also suggested the chart was just the "tip of the iceberg" and that many other transactions could be used for conviction. And, finally, the trial court never provided a *Petrich* instruction. According to Purple, this was error.

Purple also contends that the State cannot show that this error was harmless beyond a reasonable doubt. She specifically points out that many of the transactions needed to be aggregated because they were less than the $5,000 threshold. She also contends that the evidence about some of the transactions was conflicting—testimony suggested that some of the payments were actually for Joan's benefit and some were impossible to discern. Because of this conflicting testimony, some jurors could have relied on different transactions in order to find that she was guilty of counts II and III, depriving Purple of a unanimous verdict. Thus, Purple argues, her convictions for counts II and III should be reversed.

The State concedes the error. It appears to concede that it failed to adequately elect specific transactions to support counts II and III (notwithstanding the tables of the transactions). And the

State also accurately notes that the trial court failed to provide a *Petrich* instruction and that the jury instructions were deficient because they failed to require an express finding of a "common scheme or plan." Br. of Resp't at 10. However, it contends that the error is harmless. The State argues that given the overwhelming evidence supporting Purple's guilt, "no reasonable jury" would have found Purple not guilty of counts II or III. Br. of Resp't at 13.[5]

We accept the State's concession that a unanimity error occurred. But we are unpersuaded that the State has shown that the error was harmless beyond a reasonable doubt. While there is uncontroverted evidence that each of the transactions occurred, whether Purple was authorized to make those transactions using Joan's money was disputed. The State conceded that it was not always possible to tell if some of the transactions were for the benefit of Joan.

In this way, this case differs from *Bobenhouse* where "if the jury . . . reasonably believed that one incident happened, it must have believed each of the incidents happened." 166 Wn.2d at 895. There is no similar clarity here. Given the nature of Joan and Purple's mother-daughter relationship, there is the possibility that jurors believed that some of the transactions were unauthorized while believing others were either for Joan's benefit or were gifts to Purple and her family. Thus, without a unanimity instruction, there is the risk that each juror could have relied

---

[5] It appears that the State's arguments are rooted in the harmless error test that is typically employed in other contexts. *See* Br. of Resp't at 11 (relying on cases regarding confrontation rights and instructional error when outlining the harmless error standard). Instead of applying the harmlessness standard discussed above, the State argues that it is sufficient for it to prove that "there is 'overwhelming evidence of the defendant's guilt that is not tainted by error.' " Br. of Resp't at 11 (quoting *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015)). However, as our Supreme Court has stated, failure to provide a unanimity instruction is harmless "only if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Coleman*, 159 Wn.2d at 512.

on a different combination of transactions that they believed were unauthorized to convict Purple of these two counts. Reversal of counts II and III is required.

III. SUFFICIENCY OF THE EVIDENCE

Purple next argues that there is insufficient evidence to support her convictions for count IV (first degree theft from a vulnerable adult between January 2019 and April 2020) and count V (money laundering). We disagree.

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). With the evidence properly construed against the defendant, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

As noted above, count IV, first degree theft from a vulnerable adult, was premised on Purple's purchase of the Tillamook vacation home. To prove this count, the State was required to prove that (1) Purple wrongfully obtained or exerted unauthorized control of Joan's money in an amount exceeding $5,000 with the purchase of the Tillamook house, (2) Purple intended to deprive Joan of these funds, and (3) Purple knew or should have known that Joan was a vulnerable adult. RCW 9A.56.400(1)(a).

Count V, the money laundering count, was contingent upon the State's ability to prove first degree theft for the Tillamook house. For the State to prove Purple was also guilty of money laundering, it was required to show that she conducted or attempted to conduct a financial transaction involving the proceeds of a "specified unlawful activity" (here, first degree theft) with the knowledge that the proceeds were of the specified unlawful activity. RCW 9A.83.020(1).

Purple argues that the State failed to prove she committed first degree theft from a vulnerable adult related to the Tillamook house, and consequently failed to prove both counts IV and V. She contends that the State presented "no evidence" that Purple deprived or intended to deprive Joan of her property. Br. of Appellant at 40. Purple points out that the Tillamook house was purchased as a vacation home under "Joan Selin LLC," a corporation in which only Joan had a financial interest. Br. of Appellant at 41. Further, even when the LLC was dissolved, Joan remained the owner of the home and elected to continue using it for vacations with the family.

The State disagrees, responding that that there is "substantial evidence" that Purple "removed [Joan]'s funds and tied them up in the Tillamook house to separate the assets from the guardianship proceedings . . . ." Br. or Resp't at 16. The State contends that circumstantial evidence proves Purple's intent. The timing of the LLC's creation, the state of Joan's dementia, and the structure of the LLC all show that Purple intended to deprive Joan of her property with the purchase of the Tillamook house. As for the timing, when the LLC was created, there was about to be a guardianship hearing for Joan, after which Purple would know that her access to Joan's money would be jeopardized. And at that time, Joan's dementia made her unable to take care of her finances, much less create, own, or operate an LLC. Finally, Purple's husband, Cosby, was

23

named the chief operating officer of the LLC. Combined and construed against Purple, the State argues that sufficient evidence proves an intent to deprive.

We agree with the State. Taking the evidence in the light most favorable to the State, there is sufficient evidence to support an intent to deprive. Notwithstanding that contrary inferences are possible from Joan's own use of the house, a reasonable juror could find from the circumstances of the LLC's creation and its structure that Purple intended to deprive Joan of her assets. *See Miller*, 179 Wn. App. at 105 (circumstantial evidence is equally reliable to direct evidence). Thus, there is sufficient evidence supporting the jury's finding of first degree theft from a vulnerable adult for count IV and count V.

## CONCLUSION

We reverse Purple's convictions for Count's II and III and remand for further proceedings consistent with this opinion. We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, A.C.J.

We concur:

MAXA, J.

GLASGOW, J.

24